Good morning, Your Honors. I'm John Heller. I represent the plaintiff, Barry Hazle. I'd like to reserve five minutes of my time for rebuttal. All right. Try to keep track of your time, and I'll try to remind you. Thank you, Your Honor. Time permitting, I'll be addressing three issues, Your Honors. First, why the judgment that was based on the jury verdict in which there was a finding of no joint and several liability among the three CDCR defendants should be overturned. Second, why the summary judgment in favor of a separate state agency or private actor acting as a state agency, Westcare, should be reversed. And third and finally, why the injunctive relief claim was incorrectly dismissed as moot. Referring to the first point, which refers to the jury verdict and the judgment that was entered on that verdict, there are several reasons we've advanced as to why that verdict should be overturned, and I'm going to focus on three of them. I ask, first of all, was there any objection to the verdict at the time it was entered? At the time it was entered by the the time of the court? The time the verdict was? No, there was none, Your Honor. And the reason was, under the Ninth Circuit authority, without a inconsistency within the verdict, there's no obligation to object to the verdict at the time it's You're claiming there was no inconsistency when no damages at all were awarded when the they were supposed to award nominal damages? Thank you. I misspoke. I mean internal inconsistency. Within the verdict itself, there was nothing that of the various interrogatories that the or the questions that the jury answered that was inconsistent with another answer which they gave, which is the standard of internal inconsistency in which you are required to preserve the objection to raise an objection. At that point, the verdict itself was entirely consistent. It was defective because it had been it was plagued with errors, namely from the instructions. In other words, the jury had been told that they could find whether or not these defendants were jointly and severally liable when, in fact, they had already been found jointly and severally liable. But within the verdict itself, Your Honor, there was no internal inconsistency that could have been reconciled had the judge sent the jury back into the jury room for further deliberations. And that's the standard that applies to preserve an appeal. The authorities we've explained provide that if there's not that internal inconsistency, there's no obligation to object to the verdict form in order to preserve the appeal. So as I mentioned, there was an instruction, a set of instructions given and a verdict form by the court on joint and sever liability that were indisputably in error. The fact was that the defendants, the CDR defendants, were jointly and severally liable for the unconstitutional deprivation, unconstitutional imprisonment of Mr. Hazell. There's no objection or there's no dispute from the other side on that point. There's no doubt as well that the judge erred in putting that issue, joint and sever liability, to the jury as a factual matter. And again, the CDCR defendants don't dispute that either. There's no dispute that this was a prejudicial error because it permitted the jurors to find no joint and sever liability when, in fact, under these facts, unconstitutional imprisonment, joint and sever liability existed as a matter of law. So there's no dispute on prejudicial error. The only the defense rests, their argument, on waiver. And for two reasons, that argument is not, does not have merit. First, it was not simply that Mr. Hazell alerted the district court to its position on joint and sever liability through his jury instructions and through the verdict form. That under controlling law may itself have been enough. He went beyond that and explained to the district court in three separate briefing opportunities, his trial brief, the brief that accompanied his jury instructions, the brief that accompanied the verdict form, his position that joint and sever liability was one of the critical issues of disagreement between the parties, and his position that the defendants were jointly and severly liable, jointly and severly liable. The district court recognized, acknowledged Mr. Hazell's position and understood that position. That's at the ER 83. And Mr. Hazell reaffirmed his position that joint and sever liability applied here and that it was an indivisible injury that should not be put to the jury for apportionment. Kennedy, you raised that point for waiver purposes, right? That's you're just saying there was no waiver. Correct. Correct. But does the other side contest that under Floyd v. Laws that a constitutional violation requires compensatory damages? It is not. In their opposition, the defendants did not dispute the fact, the prevailing law. Granted, there's not law in this circuit, but under the Second, Eighth, and Eleventh Circuits have confirmed that an unconstitutional incarceration, an unconstitutional imprisonment necessarily requires an award of some amount of compensatory damages.  And I think that's a good point. The other side, under the Second, Eighth, and Eleventh Circuits, they offered authority from this circuit or others that disputes the notion that actually Floyd v. Laws is our case. It was 1991. But assuming that this is constitutional, which is the claim, then an award of nominal damages at the least is mandatory, right? Yes, in some cases, but here even more. And let me see if I can explain what I mean by that. First, this was an unconstitutional imprisonment. That was what the district court found. That decision, that ruling has never been challenged or appealed. Second, in many cases, an unconstitutional deprivation of a right will itself, even without damages, give rise at least to a nominal damage award. There must be a nominal damage award, and that's, I think, what you're referring to. In the case of an unconstitutional imprisonment, that goes one step further. In that situation, an award of nominal damages is not enough. There must be compensatory damages. And the reason is clear when you think about it. An unconstitutional incarceration is itself an injury. In this case, it was a hundred days in State prison in circumstances that were indisputably overcrowded and dangerous. Unlike other types of unconstitutional violations, an unconstitutional incarceration must necessarily give rise to some amount of compensatory damages. The amount is left to the jury's discretion. If it were simply a claim for emotional distress, would there be any requirement that there be more than nominal damages? No, Your Honor. That's a perfect example of a situation where the jury needs to find some amount, nominal damage award, but need not find that there was actually emotional distress that's quantifiable or damage. Or. Extinguish that from an imprisonment. Yes, I do. That is necessarily damages. Exactly, Your Honor. And the Second Circuit articulated the rationale for that in most detail in the Kerman case, which we've cited, and it explains how in that situation, unlike others, you have the injury is itself inherent in or part of the violation. It's not simply a case where somebody's rights have been technically violated. There, in that case of an incarceration, an unconstitutional imprisonment, there has been an injury. And that is one of the reasons why, one of the three reasons, primary reasons we've identified why in this case the verdict for no damages needs to be overturned. Let me ask you one question. I know you want to save your time on rebuttal. Let's assume, arguendo, that you get a new trial because there was no, there were no damages awarded and constitutional infringements require an award of some kind. A compensatory. A compensatory, right. The judge ruled on the issue of the third-party prison keeper. I believe that was Westcare, in summary judgment. If we were to send this back in a new trial, would we, should we direct the court to reexamine that issue as well, and if so, why? Yes. We've proposed, Your Honor, that under these facts, the fact that Westcare, the State agency, a nonprofit acting as a State agency, had contracted solely with 12-step programs many years after the Ninth Circuit's, this Court's decision in a way, had created a network solely of 12-step programs is enough under the setting in motion standard to impose liability or to, to require a ruling that they share liability for the violation. And is that because there is evidence in the record that suggests that your client communicated with Westcare directly his particular concerns? Yes, in part. Three, three things happened. First, Westcare contracted solely with a network of, of programs that used in this region one, which extends from Kern County up to the Oregon border, with, with entities that do 12-step program and have religious components. But why isn't Westcare just a broker between the prisons and the rehab facilities? Because they act as the State agency. The State functions have been essentially outsourced to Westcare in order to, to fulfill the functions of, of selecting these facilities. And, and because of that, they owed a, they had a constitutional obligation to ensure that that network was constitutionally sound. In a situation in which there's only religious-based treatment centers, it becomes inevitable or at least very likely that there's going to be a constitutional violation in that particular situation, coupled with the fact, as, as was mentioned earlier, they had direct contact with both the parole officers and Mr. Hazel, in which they told him there were no secular alternatives when he raised his concerns and directed him to remain in the religious-based treatment facility. So that, both that, that function coupled with their direct involvement here is why, to answer your question, Your Honor, at the very minimum it ought to be sent back to the trial court for the jury to resolve the question of foreseeability, which is basically the issue here on Westcare. Was it foreseeable that their various actions, both in collecting the, the facilities and in directly interacting with Mr. Hazel, would lead to the constitutional violation? At that point, if the jury were to conclude, yes, it shares liability, that joint and several liability issue would then proceed to the next part of the trial, which would be the damages phase, where the court would be, the jury would be instructed as we. Kennedy, I want to ask you one question about the facts. Yeah. Did Westcare tell the plaintiffs that the, there were no non, non, non, there were no secular facilities, or did they tell him that Empire was not a religious facility? They told him that when he, when he raised his constitutional concerns directly with Westcare, they told, they told him that there were no secular alternatives, and they directed him to remain at the Empire facility. That's at 354, 445, and 447. They told his parole officer when he consulted them there were no secular, no non-12 step programs in Northern California. Was that true or false? As far as we know, the record suggests that, that up until the point of summary judgment and the ruling on the, on the, on the injunction, Westcare had contracted solely with 12-step programs all through Region I, which is where they had control and responsibility. I'm not sure that answers. I'm sorry. Did the record show whether it's true or false that there were no non-secular facilities? There were no non-religious facilities. The record reflects this, Your Honor, Judge Reinhart, that the facilities with whom Westcare contracted, which are the ones that parolees can go to, were only what, 12-step programs. Well, that still doesn't answer the question. Whether the record shows whether there were alternatives that were not non-religious. Oh, yes. I apologize. Now I understand. Yes, we submitted in opposition to the summary judgment motion evidence of non-12-step programs that existed within the State to which we contended had they taken an active hand in the constitutional violation. Mr. Hazell could have been and should have been redirected to. Thank you. I'll reserve the remainder of my time. 12 seconds. Well, in some cases, you get more than they're given, too. This one's got a lot of issues already for me. Good morning, Your Honors. I'm Vicki Whitney of the Attorney General's Office, representing the correctional defendants in this case, Crowfoot, Wilding, Jollins, Cate, and Kernan. I want to let the Court know that I will be taking 10 minutes of our 15 minutes for my portion of the argument, and counsel for Westcare will be taking the last five minutes of time for his argument. Could I just ask you a preliminary question? Sure. Why was it appropriate to allow the jury to reconsider the question of causation when the district court had already decided it? Your Honor, the jury was not instructed to consider the question of causation. The record bears out that the judge was concerned about the wording in the verdict and, in fact, the jury instruction that was proposed by Mr. Hazel about whether any of the defendants or other actors were the cause of any damages. And so those jury instructions went to the jury, the verdict form went to the jury unobjected to and, in fact, agreed to twice by Hazel. And the testimony that came out during the examination showed that these individuals just didn't have the authority to do anything other than what they did, which was relevant to the issue of the punitive damages claim. Now, the judge asked counsel whether there he should send in a clarifying instruction about the use of the word cause in the verdict form while the jury was deliberating and when the question from the jury had come out to try and clarify to make sure there was no confusion about that issue. Mr. Hazel's counsel declined that invitation to send in any clarifying instruction. He said, and I quote, that the jury has been appropriately instructed on that issue and let it go. And so the verdict form to which Mr. Hazel's counsel agreed twice, the jury instruction on compensatory damages, which allowed them to determine whether any of these three defendants, Crowfoot, Wilding and Jollins, had caused any of the damages, that was unobjected to. That went to the jury. And when the jury came out with its verdict in the end, the district court expressly asked, is there anything further to address with the jury? Mr. Hazel's counsel said, no, Your Honor, and he let it go. Your Honor, Judge Nelson, you touched on this, and that is the verdict. This whole notion of internal inconsistency in the verdict form. That was an opportunity where the judge afforded counsel, Mr. Hazel's counsel, at that time the opportunity to discuss what happened in the verdict. I sure as heck know, because I tried the case, that if I had had that verdict, I would have immediately advised the court of my objections to it and asked for further explanation. And the judge did that. He let it lie dormant. He let the jury be excused, and they went on their way. And one other important aspect is to point out, while the jury was deliberating on the issue of the joint and several liability and the cause issue, the judge expressly asked Mr. Hazel's counsel, are you asking me, are you seeking a directed verdict? The answer was, no, Your Honor. A silver platter could not have been extended more than this judge did, and it was rejected every time. And I would focus, Your Honor, just stepping back, there's a quote from author James Thurber that I think is very apropos here. He said that there are two kinds of light, the glow that illuminates and the glare that obscures. And that is what is happening here. Mr. Hazel's attempts to cast a glare on the jury's verdict and the district court's management of this trial by presenting isolated vignettes without regard to his own errors and missteps and waivers on the record is seeking to obscure his own misjudgments. The full record of this case, Your Honors, illuminates that the jury was faithful to the instructions and to the verdict form they were given. But counsel, on the issue of the mandatory inclusion of at least domino damages, that has nothing to do with jury instructions, does it? That's a matter of law. Well, there was a jury instruction, yes, Your Honor, on that, that was given to the jury. And again, one of the fundamental things I would point out about that, that is not what Mr. Hazel's counsel would clarify as an internal inconsistency that would relieve some kind of obligation to object. There was a motion for a new trial, right? There was a motion for a new trial. It did talk about zero damages, Your Honor, and that was one of the issues. And on that basis, based on our case law, wasn't it a requirement that there be at least nominal damages? The instruction, yes, that is a requirement, Your Honor. The problem is, again, Mr. Hazel's counsel waived that and let the jury go. And so that is not something that this Court should correct. Can you waive a constitutional requirement? You can waive an issue with respect to the verdict form and what the jury found. You can waive an issue with respect to the jury instructions, to what you agree  I gather all of that. But the judge, the judge was asked to take care of this issue as a matter of law. If the law says you have to have at least nominal damages and they didn't get it, does it have anything to do with the jury or the jury instructions? Well, I would say yes, because the jury, taking back just a step, Your Honor, there was stipulations that were read into the record at the very beginning, to which counsel both agreed, that allowed the jury. It said to the jury, there's been no determination of if any emotional damages exist, and it's your job to determine if they do or if they have been found to exist. That was a stipulation which, again, results in you can't back out of the stipulation that allows the jury to make that determination, which they did. Secondly, is the issue, again, of a waiver. When you've invited the error, as Hazel did in this case, you cannot then have a waiver focus on the court's error or any other error because you've invited it. That doctrine absolves any other fault in this case. Including constitutional error? Well, Your Honor, it doesn't necessarily amount to constitutional error here, because based on, again, the fact that he never objected to that portion of the verdict form before the jury was released. Perhaps I'm missing something. I've never heard the concept. That because counsel didn't object in this case, that somehow the constitutional error is overlooked. And I apologize. I didn't mean to be stating it that way, Your Honor. I think in this case, what we have to look at is the entire picture. And one of the notions, and let's face the reality of this. I think we can't turn away from it. If Mr. Heller, if we go back and we give him $1, this is a case about attorney's fees. It is not a case about the individual's rights. But even whatever the ultimate result, if he's entitled to nominal damages, he's entitled to nominal damages. Whether that will lead to attorney's fees or not, what does that have to do with it? Well, it has to do with the fact that the emphasis in terms of an overall picture of justice, which we all have to do in a case. Well, that's the difference. If we can decide this case on the basis of justice, and that's what you'd like us to do, maybe we'll do that. Do you think the State would really be happy if it were decided on the basis of justice rather than technicalities about waivers and when you have to file something? Is that your suggestion, how we decide it? No, Your Honor. It's not. However, I would say. They don't want us to decide it based upon what's just. No. What is just is what the jury decided in this case. And I would say, you know, looking at specifically one of the issues, talking about this whole loss of liberty concept and whether he lost liberty by being incarcerated, let me focus on the testimony that was given by Mr. Hazel at the trial. He says that when he went from the prison to Empire, quote, it's not considered a release. It's considered in custody still. When you get sent to the inpatient residential treatment, you're still in custody. I asked him, so you were still in custody then? Response, uh-huh. I asked him again, in essence, that's an extension of your incarceration? Answer, yes.  Well, obviously, there is a difference, Your Honor, but this was his testimony. Well, his testimony is legally correct. It is in custody, but it's not being in prison. The question is, are there damages from being in one type of facility, and not in another   facility, rather than the other? And to say that both legally are considered custody doesn't really answer that question. Well, it does on the extent, if you're looking at this one component out of the Second Circuit that's being argued to exist here, because loss of liberty, you're in custody still. Under the civil addict program in California, your custody does not end until you've Mr. Hazel was not free to leave the facility, and yes, there's a difference. Quite obviously, there's a difference between being in a prison with inmates and being in a facility doing drug rehabilitation. But he got the benefit of being able to do that as a civil addict, because the moment he completes his course, his charges from the superior court conviction are expunged, unlike a normal felon, and unlike in Inouye, where the parole agent there actually imposed the conditions of being in the facility. In this case, the evidence was very clear that Crowfoot, Wilding, and Jollins did not impose the conditions that he be an impire. They could not change or modify that condition, and he had to – they had no choice in the matter, so they sent it back to the board who did impose it. It would be very unjust to impose damages against them for something they didn't have authority to do. And I would point to the Court's recent decision in Peralta v. Dillard, where this Court flatly said that you can't look at an overall picture and fault individuals for what might have been error in a larger scheme. And it said, and quote, We must take a very individualized approach which accounts for the duties, discretion, and means of each of the defendants, and the testimony to which Mr. Hazel opened the door in this case showed that none of these defendants were responsible for any damages to him in this case. And I see I've probably run past my leaving five minutes to counsel. I'll apologize and let him go. Kennedy, it's all right, we'll give him five minutes. May it please the Court, Mark Bonino, appearing on behalf of West Coast Law Enforcement and the Department of Homeland Security, I would like to ask you about WestCare, a residential facilities coordinator for the State. And just to start out, because this seems to be part of the focus, it was not WestCare that assigned Mr. Hazel to Empire. Empire is a specific facility that Mr. Hazel was in following his parole. Well, let me ask you a question about that. WestCare did not contract with any nonreligious groups. Wasn't its responsibility to provide the residential treatment for any prisoner? No, Your Honor. That's the end. I'm glad you asked that question, because the point is that WestCare was a provider or a network creator for this. It was not the network creator for the entire State of California. And in fact, under the law, these prisoners, or these parolees, excuse me, at this point, can be transferred from location to location. Generally, they try to place them in a specific area. But the State, under the civil attic program, which is the program under which this organization operates, the State says that they can go outside and they could for example, the State could contract with some religious organization itself to provide some treatment facilities for these various networks. That doesn't mean that those religious organizations have to absolve themselves of all religious connections. It just means that they're not supposed to impose the religious observances on the parolees that come to their particular facilities. Didn't WestCare then have a duty to decline to place this prisoner? Your Honor. They did not contract with any nonreligious groups? The prisoner was originally placed under parole under the conditions of parole established by the parole board itself. The conditions did not include any assessment of the prisoner's status as, or his religious beliefs, whatever they were or were not. And in fact, remember, Your Honor, this is a case that came up at least from the standpoint of WestCare on summary judgment. At the time of summary judgment, the pleadings were what were the focus of the claim against WestCare. And the pleadings noted that after, after paragraph 19 of the pleadings of the complaint, after he had arrived at Empire, he decided that he did not want to be placed there because, he told us, he was an atheist. And at that point, WestCare, as you phrased it in a way, as a broker of these services, had no options available to it, because even if WestCare was in the exclusive control, which it was not, it had no power to transfer parolees from facility to facility or move or remove conditions or change anything else. Those conditions were set. What couldn't they decline to take him? I'm sorry. WestCare? Yes. Your Honor, I don't know that WestCare could decline to take him. They were assigned, they were asked where to send a parolee coming out of that county. They had, I believe, two facilities in that particular county, and they sent him to one of them. The other one was a more religious facility, the Cornerstone facility. That's in the record. Didn't Hazell, in his, in his declaration that was before the Court, say that he informed WestCare that he was an atheist and that a WestCare representative told him he should go to Empire? Was that not in his declaration, the term of summary judgment? Your Honor, I believe the atheist declaration came after he was already there, and she told him to stay in Empire. I'm interested. You and your other counsel have indicated that my people are not responsible. She says that these three individuals who are named are not responsible. You say you're not responsible. Who is? Somebody made this decision. Was it the parole board? Your Honor, I believe, and I was not present at the full trial in this matter, but my understanding is that the decisions that were made were made at the level of the parole board and the, excuse me, the Narcotic Addict Evaluation Authority, which is a subsidiary, excuse me, of the parole board, as well as the director of adult parole operations. Those are three entities that are involved in the parole process. So you're saying it's your testimony, then, that WestCare simply carried out a written instruction from the parole board. Is that right? WestCare was contracting with the parole board to provide a network of facilities to which these prisoners could go. I understand that, but let's take Mr. Hazel. Mr. Hazel gets assigned. Who assigned him? The parole board, Your Honor. Okay. So the parole board, did they assign him to you for you, then, to make a determination? No, Your Honor. No. He is assigned to the facility by the parole board. Okay. So he was assigned to go to Empire. Right. Okay. So you didn't make that decision. No, Your Honor. What's your role in it? You just have a contractual supervision, basically. WestCare created a list, a network, and they contracted with. They're not they just didn't give the State a list. They contracted with a number of facilities, these residential care facilities, that would provide this residential treatment for these parolees. And then they would, they gave the names of these various facilities to the State. And WestCare had representatives throughout the State who would consult with the parole board. But the decision on where these people are placed goes with the parole board. So it's your representation that somewhere in the record is a direction of some kind that assigns Mr. Hazel to Empire. Yes, Your Honor. Not to you. Yes. I mean, from the parole board, yes. Yeah, right. You had no contact with Mr. Hazel before he went to the facility. I don't believe that. That's not the allegation in the complaint, Your Honor. The allegation in the complaint was after. Well, no, it doesn't stop with a complaint. It's a motion for summary judgment. And are you saying that we can tell from the record that you had no contact with Mr. Hazel, or you can't tell? What were the declarations at the time of summary judgment? The declaration from us was, Your Honor, that he had been placed on parole. He had signed off on his conditions of parole, and that's where it came to WestCare at that point. That you had no contact with him before he went to Empire. No, Your Honor. No, you had no contact? No, we had no contact with him before he went to Empire. And that your declaration the declarations also show that you provided the State with a list of exclusively of organizations that were all had religious connections. No, Your Honor. The declarations in that are in conflict. There was a declaration for Mr. Lee that said there were some non-twelve-step First of all, these are twelve-step, and I understand that for the Court's purposes that may be synonymous with religious, and that may be a question for another place, another venue. The declaration says that there were some non-twelve-step facilities within the list. They were asked to name some in the depositions, and they could not do so. So there is an issue of fact as to whether or not the only facilities provided by WestCare were or were not twelve-step facilities, but WestCare was not the exclusive provider of facilities to the State. Thank you. Thank you, Your Honor.  I have a couple of questions, as far as I can see, that you might care to comment on. The first is the argument that on several occasions you agreed to the instructions to the jury, including to the their obligation to decide joint and several liability, and that you were asked if you had any objections, and you said no, and after the verdict came back, you also said no. What is the response to that? Addressing that point, Your Honor, we briefed to the district court our position on joint and several liability on three occasions. First, in the trial brief, identifying our position on joint and several liability and why apportionment was not appropriate in citing cases. Second, in a special set of briefs that accompanied the verdict form and why our verdict form should be used as opposed to the one that the defendants. Third, in response to specific objections of the defendants' jury instruction, saying that the defendants should be treated separately, we objected to that because it was inconsistent with the joint and several liability finding that was inherent in Judge Burrell's ruling that these defendants were liable. Having done that three times, there was no – there's not an obligation under California law to keep pestering, to keep hounding on this door. We lost that issue. The jury – the judge decided to put joint and several liability to the jury incorrectly, in our view. He understood – the record reflects that he understood our position on joint and several liability because he noted plaintiff argues there's joint and several liability. So that's at ER 83, ER 83. We reminded the judge that our position was joint and several liability for the actions. That was at ER 38. We reminded the judge, as you know from our instructions, this is an indivisible injury. That was at ER 50. Under the case authority that we've cited in the Medtronic case and the other cases similar to it, that is enough to put the – if the judge is aware of your position  that is sufficient to preserve the issue for appeal. The reality of the case is that the jury's instructions that you submitted you say were different from the ones submitted by the defendant? Yes, they were. And was that – did that difference reflect your position on joint and several liability? Yes, it did, because it did not – it did by omission, in a sense, because once they had been established to be joint and several liable, there was nothing for the jury to find. In other words, the putting the issue to the jury was the error here. Our verdict form, which went with the jury instructions as well, simply asked what are the amount of damages you find. That's consistent with and approved by the cases that recognize joint and several liability. So under those circumstances and under the plain error doctrine that has been adopted now or recognized by the Ninth Circuit, the fact that we did not object when the next iteration of jury instructions was presented by the Court will not be a bar to Your Honor's accepting us for review on that issue. As to the question that Mr. Bonino raised about Westcare and its contact, I wanted to address that briefly, if I may. In the undisputed facts, in support of our motion for summary judgment, we posited the following, and this is at ER 353, prior to his release on parole in February 2007, Hazel told correctional authorities and Westcare representatives that he was an atheist and requested placement in a treatment facility that did not contain religious components to fulfill the condition of his parole. A Westcare representative advised him that he should ask to be assigned to the Empire Recovery Center. That was undisputed, ER 353. As to the point that, Judge Nelson, that you raised, I wanted to focus on the inconsistency of the verdict issue and specifically address the finding in Cody by this Court. The issue is whether there is a conflict between two legal conclusions by the jury. That's what defines inconsistency for the purposes of an obligation to raise it or waive it. And in this case, we've heard nothing from the other side as to any legal, any conflict between legal conclusions that is inherent in this verdict that would give rise to a waiver or that would be. The conflict is with, between the jury verdict and the judge's determination? Well, the conflict is between the – it's a good question. The conflict here is between the fact that the jury was allowed to find a no joint and several liability when, in fact, joint and several liability existed as a matter of law. It was incorrectly put to the jury, allowed – they were allowed to rule on that issue, which is a legal issue, and found the wrong conclusion. It permitted them, again, in conjunction with the supplemental instruction that the And as a result, they were able to exonerate the three named defendants who were joint and several liable for what had happened, for imprisoning Mr. Hazell from any compensatory damages. As Your Honor noted, compensatory damages is a fundamental issue. It's – the Kernan case recognized that because that's a Second Circuit case where the – where counsel had not opposed any jury instructions or verdict form. But because there was no award of at least some compensatory damages, the jury was able to exonerate Mr. Hazell from any compensatory damages. It was overturned for a new trial. And that's because it's fundamental error. Thank you, Your Honor. Thank you very much.
judges: Nelson, Reinhardt, Smith